STATEMENT OF FACTS.
In May, 1892, the United States National bank held thirty thousand dollars of stock in the National Bank of Guthrie, as collateral security for a loan of that amount and brought suit against that institution, L. DeSteiguer, its president, and its other officials, alleging in the petition, sworn to by a stockholder, among other things, that the latter bank was insolvent, that its funds had had been and were being fraudulently embezzled for his own use and misapplied and squandered by DeSteiguer, and its other officers, who were also insolvent. The petition averred that a large quantity, probably forty thousand dollars, of the bank's assets had been made away with by the defendants, and prayed for a receiver and a final winding up of the bank's affairs. The petition was drawn up by Mr. Wisby, who appeared as attorney for the United States National bank. The answers were drawn in behalf of the bank by Harper S. Cunningham, who appeared for DeSteiguer and for the defendant bank, and signed the separate answers of each of them. The answer in behalf of the bank averred that "this association *Page 165 
is free from liabilities of all kinds." To which answer, James E. Turner, as qualified and acting cashier of the National Bank of Guthrie, swore to as true "in substance and in fact." Afterward the signature of Cunningham was stricken from these answers, and they were then signed by Charles A. Berger, as attorney for the defendant, DeSteiguer, and also as attorney for the National Bank of Guthrie. Thereafter, as testified to by Mr. Cunningham, a private agreement was entered into between Mr. Wisby and himself whereby, without notice to the creditors or the stockholders, they agreed that Cunningham should be appointed receiver, and that, "if the court would consent to it, that I would employ him (Wisby) as attorney for the receiver." This arrangement was afterwards confirmed by the court. J. W. McNeal, a banker of Guthrie, was at the time also a candidate for appointment of receiver.
Much testimony was taken before the district court upon the exceptions below, both oral, by deposition, and including the record itself. It appears from the testimony of Mr. Cunningham that the next day after his appointment by the court the judge, Green, came to him and asked for money, saying that he must have money for an immediate payment demanded by McNeal; that he was not yet in the possession of the assets of the bank, and that he, (Cunningham) assisted the judge in procuring a loan of five hundred and fifty dollars from DeSteiguer out of the assets of the bank of which he had the day before been appointed receiver. The judge of the court who had thus made his appointment as receiver, and received the loan, as stated, was already indebted to the National Bank of Guthrie in the sum of one *Page 166 
thousand and sixty dollars, to which the new loan was added, the whole embodied in a single note then aggregating $1,610, which was dated back thirty days, and made payable to the National Bank of Guthrie sixty days after date. This note became a part of the assets of the bank pending the transference of the assets to the receiver, Cunningham, and was the next day after the loan was made, turned over to him as a part of those assets.
A day or so after, June 16, and before the receiver had qualified and taken possession of all of the assets, a representative of the comptroller of the currency came to Guthrie to take charge of the bank and to examine its books and assets. The assets of the bank were at that time in the process of delivery by the president of the bank, DeSteiguer, to Cunningham, as receiver, but leaving forty thousand dollars of them uncollected from the insolvent institution, and, as he testified, at the hearing before the district court, Judge Burford presiding, he was not "at the time hunting more assets," and after consulting with the judge who appointed him as to what his proper course would be to avoid giving to Mr. McKnight, the representative of the comptroller, an examination of the books, left the Territory for a month. Mr. Cunningham further testified that he never made any examination of the books of the bank, in order to ascertain what he, as receiver, was entitled to and whether he had received all the assets which he was entitled to, because he could not understand them himself, and because "DeSteiguer and Turner had said that they balanced the books."
After the arrangement by which Cunningham was *Page 167 
made receiver and Mr. Wisby made attorney for him, as receiver, and because of it, the United States National Bank discharged Mr. Wisby from its employment. He was, however, retained by Mr. Cunningham as attorney for him as receiver, and appeared for him upon several applications made thereafter by the United States National bank and other creditors for his removal. A schedule of assets filed by the receiver showed the nominal assets to be one hundred and twenty-one thousand dollars. Of the money collected out of this sum, the receiver collected during the first six months the sum of $6,549.45, and $334.20 from rents; during the second six months he collected $3,724.01 and $879.98 from rents, and during the third six months the proceeds from collections was $753.81 and from rents $854.95, making a total collected during the first eighteen months of $13,096.00. During the ensuing fifteen months the receiver collected $4,561, making a total of $17,658. A final statement was not made before Judge Green, when he went off the bench. His successor, Judge Dale, was interested as one of the bondsmen of the receiver, and the case was taken upon change of venue to Judge Burford.
The receiver, under order from the court, filed a second report of his proceedings on August 23, 1894. On November 5, 1894, exceptions were filed to this report by the United States National bank, and other stockholders, and on the 4th day of May, 1895, the receiver filed his third report. In this report the receiver claims among other credits to which he is entitled, $1,601.15 for clerk hire, $540 for rent of office, $1,611 for expenses of travel, $2,256 for attorney's fees, $500 attorney fee for himself, and claims of his own amounting to $997, *Page 168 
and after charging himself with $17,658.70, claims a balance due to him of $1,065.79. He states in his testimony that he had never examined the books and was "obliged to say that I cannot tell anything about them, and I had never really tried, for what examination I had given them shows that they are too complicated for me to comprehend." And that, if any trouble arose that Mr. Turner, the cashier, who had sworn to the petition that the bank had no liabilities and had been employed by the receiver as his clerk, would, if any cause arose for it, look it up and he would adjust it in that way. Receipts for expenditures were in many cases not taken.
The bank held a large claim against DeSteiguer, who was also indebted to the receiver for personal services. At the instance of the receiver, DeSteiguer came to Guthrie at different times in order to give information to the receiver about the bank's affairs. The expenses of these trips of DeSteiguer were compensated by the receiver to DeSteiguer by taking the money out of the assets of the bank and applying it upon an amount claimed to be due from DeSteiguer to himself upon private account, thus by the arrangement recouping himself at the cost of the bank, while the bank's account due from DeSteiguer remained unpaid.
Mr. Cunningham was, under an engagement prior to his appointment as receiver, to conduct litigation in behalf of the bank against the provisional governments of Guthrie. He afterwards received warrants in compensation therefor, and turned them into the assets of the bank after its failure, taking out of the bank at the same time $997 in cash, although the warrants were then repudiated and in litigation. *Page 169 
The testimony shows that during the period of the receivership he was also attorney for DeSteiguer, and was demanding and receiving compensation from him.
It appears from his own evidence that while the National Bank of Guthrie was thus insolvent and unable to pay its debts, and its stock of no value, that he turned over these promissory notes to the makers of them respectively in exchange for the blocks of stock which they each respectively held. That among the assets of the bank when he took charge of it, he found the note of J. E. Turner for $10,000, one of E. Randall for $5,000 and one of F. H. Thwing for $10,000, one of DeSteiguer for $3,000, one of the Guthrie Lumber company (a company in which DeSteiguer was an owner) for $4,500, one of Thomas McPherson for $2,071.78, an overdraft of the Guthrie Lumber company for $1,064, one of W. I. Edgar for $1,081.60, with others in smaller sums, and that almost the whole amount of these evidences of indebtedness were accommodation paper for DeSteiguer, which was probably the proceeds of the loan made by DeSteiguer for the United States National bank, who had received the money for them. There is no evidence in the record as to the solvency or insolvency of any of the makers of these promissory notes, except of the Guthrie Lumber company. The evidence of the receiver shows that he turned these and other notes to the amount of $36,298.17 over to the makers of the notes in exchange for the worthless stock of the insolvent bank.
The evidence shows that upon the statement of the receiver made under oath that his services were worth ten thousand dollars to the trust and that he actually claimed $8,500; that with the exception of the first two *Page 170 
months of the trust, he did not collect, leaving out the collections for rents, upon an average the sum of $250 per month which he claimed per month as salary.
The receivership was granted upon a showing of the mismanagement of the bank and misappropriation on the assets of the bank by its president, DeSteiguer; it appeared in the evidence of Mr. Cunningham, that DeSteiguer controlled stock which he turned over for the notes of Thwing, Rannels, himself and others, and that $36,298 of notes on which DeSteiguer was liable were turned over to him for $35,000 of stock held by him after the failure.
DeSteiguer had been indebted to the bank, therefore, in the sum of $36,298 and the receiver's interest, as such, in behalf of the bank was adverse to the interest of DeSteiguer, and yet, notwithstanding this fact, he remained in the employment of DeSteiguer as his attorney for three years, and as has been said, collected fees from him, and it was pending this duplicate arrangement by which the receiver stood in the position of defending the interest of the bank, as receiver, and adverse to the interest of the bank, as attorney for DeSteiguer, that he turned over to DeSteiguer this large amount of notes while claiming compensation from the trust at the rate of two hundred and fifty dollars per month. This partial statement of the matters which appear from the testimony of the receiver himself, has been made for the purpose of considering whether the district judge, Judge Burford, who presided below, exercised discretion in his consideration of and conclusion as to what was shown by the evidence. The decision of Judge Burford upon the matters involved was made orally, and taken down by *Page 171 
the stenographer. It was extended and appears of record in the case in connection with his conclusions of law. He found as a matter of fact that at the time of his appointment as receiver, Mr. Cunningham was a creditor of the bank; had a contract with DeSteiguer for the purpose of collecting claims against the city of Guthrie as yet unadjusted, and which, if the bank was a party to, would have placed him in the position of having an adverse claim at the time he was appointed receiver; that on the 13th day of June, 1892, Mr. Cunningham was on the 13th day of June, 1892, Mr. Cunningham was appointed receiver, at the time, according to his testimony, he had resigned as attorney for the bank, having been employed under a contract running over a period for which the receiver was appointed; that immediately prior to the appointment of the receiver there were two applicants for the position, Mr. Cunningham and Mr. McNeal, who was president of the Guthrie National bank; that the appointment of Mr. Cunningham was the result of a private agreement made between himself and Mr. Wisby, by which Mr. Wisby was to become attorney for the receiver; that the day after the appointment of Mr. Cunningham as receiver, Judge Green, who appointed him, informed him that he was in need of five hundred dollars and must have it at once; and that Mr. Cunningham then called DeSteiguer, against whom charges of appropriating and mismanaging the assets of the bank had been made, and upon which charges the receiver was appointed, and whose conduct had been such as to throw suspicion upon his relations to the bank, and told him that Judge Green must have five hundred dollars, and asked him to make the loan, and that DeSteiguer *Page 172 
stated that he would make the loan, and that this transaction was consummated as has been herein stated, through the instrumentality of the receiver who testified to it, and that the inference was, from the note of $1,610, which Judge Green executed at the time, that he was already indebted to the National Bank of Guthrie. That in the management of the trust, the receiver had collected and expended over seventeen thousand dollars, for which no receipts or vouchers have been taken, with one or two exceptions; that the trust has been extravagantly managed, and that many of the expenditures are unwarranted, and the court found that no orders of the court had been made, that there is no record of any advice or instructions given, and that there is no evidence as to what was done except the testimony of the receiver and the written statement made by Judge Green in the nature of an ex parte
affidavit, and that Mr. Cunningham was aware that ten thousand dollars worth of the stock of the bank had been transferred to Mr Turner; that he had executed his note for it to the bank and had borrowed the ten thousand dollars from it, which went to DeSteiguer, that DeSteiguer had taken thirty thousand dollars of the stock of the bank and had negotiated it with the United States National bank of New York, and that the evidence does not disclose where this money went to; that the receiver has not examined the books of the bank in order to find where this money went to, but that prior to the beginning of this action ten thousand dollars was loaned to Turner, ten thousand dollars to Thwing, another employe of the bank, about three thousand dollars to DeSteiguer himself, and the balance to DeSteiguer himself, part of it personally and part of *Page 173 
it to the lumber company of which he was the proprietor, and that thus the loan from the United States National bank was appropriated by DeSteiguer and his employes, one of whom, Mr. Turner, Mr. Cunningham afterward employed as his own clerk to settle the trust, and to whom he entrusted the care of all the books and accounts.
That he avoided the agent of the treasury department, whom he knew was in Guthrie for the purpose of demanding an inspection of the books, and staid away from Guthrie to keep the examiner from having access to the property of the bank, and that this was done because they were "still fearful that something would be disclosed in the investigation or examination."
That the receiver had been a "go between" after his appointment as such, between the judge of the court who had appointed him and DeSteiguer, to get the loan of five hundred dollars for the judge, and that if the books of the bank had been examined this matter would have been disclosed.
The district court found that the "report on its face presents one state of facts while the oral testimony presents another," and that certain items in the reports of credits showed to be for one thing when it appears from the testimony of the receiver that it was for another purpose, but connected with the same matter.
The district court found that the proceedings of the receiver included no direction which he could have had from the judge of the court at the time, and if any was given, was withheld from the record, in order that the creditors, stockholders and those intertested might know nothing of what was going on, and that if, upon such a state of facts, the receiver could be protected by oral *Page 174 
direction given to him by the court during that time, of which there is no testimony except that of the receiver himself that the adoption of such a rule and practice would be unreasonable, and that the testimony of such oral orders and direction from the district judge at the time, especially as it had been shown that he was interested and participated in keeping the manner in which the trust was managed secret, can be no guide to the court in now examining the account.
Upon the first item of disallowance the district court found that an item of thirty-five dollars had been charged to the bank as expenses of a trip to Kansas City upon its collection, and that as collateral security for the payment of the note, the bank had on deposit a large diamond ring; that the receiver got a sum of money on another note, that the receiver took the diamond ring himself and reported the note collected "cash." The evidence does not disclose what the receiver realized out of the diamond ring, or why he took it, but that he converted it to his own use.
It was found by the court that the receiver had gone to St. Louis to consult with Judge Green, who was at his home at Mount Carmel, Illinois; that the judge would not have been out of the Territory more than thirty days under the rules of the department of justice, and that the item of $90.25, for expenses, should be disallowed, as improvident.
An item of forty dollars charged as expenses to Kansas City was found by the court to have been unnecessarily incurred, since its purpose comprehended no more than a withdrawal of the deposits from the bank, without the consent of the comptroller of the currency, and *Page 175 
the matter could have been adjusted by sending a copy of the order of the court, and by correspondence.
The court found that the books of the bank, the property of the trust estate, in charge of the receiver, had been shipped to Chicago; that they had been put into the hands of the receiver by the court; that he was responsible for them, and that they were shipped to Chicago by mistake, through his own carelessness and negligence, and he should have had them returned at his personal expense and that the item of ninety-one dollars for expenses of the trip to Chicago to secure them should be disallowed.
Other items for trips to Wichita and to Kansas City to see DeSteiguer were disallowed because the evidence in the case showed that DeSteiguer had perpetrated a "cold steal or robbery of the bank;" that the evidence was in the possession of the receiver and known to him, and that he was not justified in spending money of the trust in getting DeSteiguer's advice upon any matter connected with the bank.
An item of three hundred and seventy dollars charged by the receiver for expenses of a trip to Washington to make a settlement with the comptroller and to get a small amount of money on deposit there, was, as found by the court, "unreasonable and not to be allowed."
Another item, March 25, 1893, to expenses to Kansas City to see DeSteiguer, forty dollars, was disallowed for the same reasons as those going before. A similar item of $162.30, August 17, 1893, of railroad fare to Denver to see one Bockfinger was disallowed as found by the court, "all the information to be procured there in connection with the man whom he went to see, one Bockfinger, could have been readily ascertained by mail." *Page 176 
A similar trip was made August 2, 1893, to St. Louis, to see one Hill, sixty-four dollars, was disallowed, the court finding that the object of his visit to St. Louis was to collect a note of two hundred dollars from Hill after he "heard Hill had received a small allowance out of some Indian appropriation." The item was disallowed, the court finding that it was improvident, and the matter could have been presented to the court and an order made in the premises, in order to justify such an expenditure upon so slight a provocation. The court found from the evidence that two desks belonging to the bank were taken from the bank to the private office of the receiver and used by Mr. Turner and himself, and that a charge of twenty-five dollars a month for a period of fourteen months against the trust for desk room, was made. The charge was disallowed. The court also disallowed a fee of five hundred dollars charged by the receiver against the trust for services rendered in behalf of DeSteiguer, Mr. Losey, Mr. Cunningham, himself, and others, to determine the validity of certain warrants given by the provisional governments of the city of Guthrie. The contract was made before the beginning of the trust. The attorney's fee was filed against himself, as receiver. The item was disallowed, the district court giving leave to again present the matter with evidence to the present receiver, Mr. Gray. The court found from the evidence that prior to the appointment of Mr. Cunningham as receiver, he had a claim of twenty-four hundred dollars against one of the provisional cities of Guthrie, and a contract with DeSteiguer by which the latter agreed to purchase and pay to him ninety cents on the dollar for whatever amount the district court would *Page 177 
allow, and that thereafter the court allowed him one thousand dollars, which together with interest for three years amounted to the sum of $997.35, and that afterwards Mr. Cunningham, having become receiver of the bank, assigned in his capacity as an individual, to himself, in his capacity as receiver, this warrant and took out of the funds of the bank the sum of $997.35 in cash, in payment therefor. The court found that the contract in this matter was signed by DeSteiguer, the signature appearing to be in his own hand-writing, while the words "President of the National Bank of Guthrie," seemed to be in the hand-writing of Mr. Cunningham, who wrote the original contract. The court adds, that "of course, those words could have been placed there before signing, but in any event the contract was a contract with DeSteiguer, and that the added words were simply a description of the person as president of the bank; that the contract is a contract with DeSteiguer," and not with the bank and does not purport to be a contract with the bank. The item was disallowed, but leave given to determine the matter as between himself and the present receiver, Mr. Gray, by proper action.
Attorneys fees were allowed on September 20, 1892, to Mr. Wisby in the sum of $692. Judge Burford found from the evidence that a retainer fee of five hundred dollars had been paid to Mr. Wisby, as attorney for the receiver at the time of his appointment as attorney, and that some time afterward the additional sum of $315 had been paid to him for specific services, making $1,507, but that these allowances had not been approved by the court, and that attorney's fees were paid to several other attorneys during the progress of the trust, and that *Page 178 
Judge Green had also been performing services in behalf of the trust which were credited upon his note due the bank of $1,610. Judge Burford found that the amount paid in compensation for attorneys' services was extravagant in proportion to the amount of services rendered, and that the times in which the receiver was advised by Mr. Wisby and services rendered, practically amounted to nothing, and were amply compensated by the fees of five hundred and three hundred and fifteen dollars respectively, and that the charges of six hundred and ninety-two dollars should be disallowed.
The claim for general compensation filed by the receiver of two hundred and fifty dollars per month for thirty-five months, amounting to eight thousand, two hundred and fifty dollars. This charge, the court found, leaves the trust in debt to the receiver one thousand dollars, after having received all the money. The testimony shows that Judge Green told Mr. Cunningham that he thought two hundred and fifty dollars per month a reasonable compensation and that that amount would be allowed to him until further direction was made. The conclusion of Judge Burford from the evidence was, that this conversation amounted simply to a statement of the opinion of the judge, and was not an order, and is nothing conclusive upon the court, and that inasmuch as Judge Green was shown in the evidence to have been interested in the settlement of the trust estate, that he was not competent to decide the matter, so as to be conclusive upon the court, and the entire item was disallowed.
The expenses of the trip to Mount Carmel, Illinois, made February 21, 1894, of seventy-two dollars and thirty cents was disallowed, because it was found in the *Page 179 
evidence to have been made in the personal interest of the receiver in "attempting to sustain himself in his relations to the trust," and that it was a personal matter of his own and for his own benefit, and not for the benefit of the trust.
A further claim, for room for one of the desks of the bank in the private office of the receiver, nineteen months at ten dollars a month, one hundred and ninety dollars, was disallowed. As was also the total sum of $485.50 for the coming to and fro to Guthrie of DeSteiguer for consultation with the receiver.
An allowance was made for the receiver at the rate of $250 per month for the first six and a half months, amounting to $1,625; for the year, 1893, an allowance was made of $125 per month, $1,500; for the second six months; and for the year, 1894, $100 a month, which amounts to $1,200, and for the two and a half months in 1895, the sum of $50 per month was allowed, making $125, up to the time the receiver was removed.
Judge Burford took into consideration that the receiver had given a large bond; that he was responsible for the property and had it in his own custody, and while it was very questionable whether the trust had been benefitted a dollar by the receivership and whether it was not worth more when he took hold of it than it was at the time of the finding, allowance was made for four thousand, four hundred and fifty dollars, with suitable allowances for office rent, reducing the total balance in the hands of the receiver to be accounted for of the sum of $6,661.81.
Opinion of the court by
We have thus reviewed the findings in each particular instance for the purpose of showing that *Page 180 
each conclusion and judgment was supported by evidence, showing in itself as to each statement that facts sufficient in themselves upon each point were under the consideration of the judge of the district court upon each point passed upon. When this is the case and when there is any evidence upon which such findings are made it will not be reviewed here. (Light v.Canadian County Bank, 2 Okla. 543; National Bank of Guthrie v.Earle, 2 Okla. 617; McClure v. United States, 116 U.S. 145.)
It was said in Hathaway v. First National Bank, 134 U.S. 609, by the circuit court of the United States for the district of Massachusetts, that "the court having heard the evidence it was like a jury, the sole judge of the credibility of the witnesses who appeared before it, and the questions were questions of fact on the evidence. It would serve no good purpose to examine the evidence critically, nor is it our province to do so. It is sufficient to say that the case was not one where there was no evidence to justify the findings of the court."
And it was declared in that case, upon authority, that, not only will the findings of fact by the lower court on the weight of the evidence not be reviewable on appeal, but that where an ultimate fact is found by the lower court, its finding or the refusal to find as to any incidental fact, which has appeared to evince the ultimate facts, will not be reviewed by the supreme court. (Following Ins. Co. v. Allen, 7 Sup. Ct. Rep. 821.)
And we must here conclude, that the conclusion of the court having been supported by evidentiary facts upon each proposition, and upon each disputed ground, that its judgment will not be here reversed.
The court, Judge Burford, attached no value to the *Page 181 
oral directions of the judge who appointed the receiver, holding that such orders should at the time have been reduced to writing, and that the court being a continuous one, and not at the time having made the orders which are here brought before us upon error, is not estopped from passing upon the matters in which written orders have not been obtained.
We think this holding correct. It has, indeed, been held that such an interest as the court had in this case disqualified him from acting. (Gay v. Minot, 3 Cush. 352.)
And that the judge having been interested as a debtor of the estate disqualifies him. (Paine v. Thayer, 105 Mass. 222.)
And that where a judge is interested the usual practice is to announce the fact and make the entry on his docket. (Moses v.Julian, 45 N. Hampshire, 52.)
The evidence shows that the judge who made the order appointing the receiver was a debtor of the bank, and that the receiver having been appointed, he thereby became the debtor of the receiver on behalf of the trust, and in a position where indulgent conduct toward the receiver might be reciprocated by indulgent treatment of the judge presiding in the court.
Upon such a situation it was said by Lord Campbell, chief justice, in the case of Dimes v. Proprietors of Grand JunctionCanal, that: —
"It is of the last importance that the maxim that 'no man is to be the judge in his own cause,' should be held sacred. And that is not to be confined to a cause in which he is a party, but applies to a cause in which he has an interest. * * * We have again and again set aside proceedings in inferior tribunals, because an individual *Page 182 
who had an interest in a cause, took a part in the decision. And it will have a salutary effect upon these tribunals when it is known that this high court of last resort, in a case in which the lord chancellor of England had an interest, considered that his decree was on that account not according to law, and should be set aside. This will be a lesson to all inferior tribunals to take care, not only that in their decrees they are not influenced by their personal interest, but to avoid the appearance of laboring under such an influence."
Upon the point of the compensation of the receiver the rule is well established that it will only be allowed when he has not neglected his duty or exercised bad faith in the conduct of the trust, committed a breach of his obligation in any way, and that it will not be allowed in a case of gross neglect or unfaithfulness, as, where he has kept no proper accounts, and has put the trust to a great deal of trouble, in determining his rights, and that if he neglects and wilfully mismanages a trust estate he can not recover compensation for his services. (27 Amer. Eng. Enc. of L. 187, and cases cited; Crook v.Lowery, 95 N.Y. 10; Thompson Estate, 35 Pac. Rep. 991.)
And it was held in Wisely v. Cobb, 24 S.E. Rep. 782, that "An allowance of $1,824.85 as commissions to the trustee of a partnership estate for the collection of and disbursement of $19,632.99, part of which arose from public and private sales of partnership property, is excessive; $773 having also been allowed for clerk hire."
The court below was, at least, liberal in its allowance of compensation under the circumstances, and no review of the order made upon that point will be had, since no cross errors have been assigned. *Page 183 
The case began in illegality and in violation of the statute, since it was provided in the Statutes of Oklahoma, 1890, in force at the time of the appointment, sec. 5110, that "No party or attorney or other person interested in an action shall be appointed receiver therein." The evidence shows that Mr. Cunningham was the attorney for the insolvent bank and claimed to be its creditor, and it is not an over statement of the case to say that, not only was the statute thus violated, but that all the steps of the trust are claimed to have been conducted up to the time the case was assigned to Judge Burford, under an interested judge. An inventory of the estate was not made as it should have been immediately by disinterested appraisers. Important expenditures were incurred and assets disposed of without any written order or showing made to the court. The receiver made no regular report or showing of his proceedings in the estate. The settlement of the estate was procrastinated. The interests of the receiver were preferred to those of the trust. The receiver was entirely ignorant of bookkeeping, of banking, got confused when he examined the books, not having tried to qualify himself for the trust. That he erased his name from the answer of the defendant bank in court, and that the only rule of compensation which seems to have been adopted was to take everything in sight. The money of the trust was appropriated to the private uses of the receiver, upon claims not due from the estate to the receiver. He never submitted his proceedings in the trust properly to the court by statement made of record to be passed upon. When finally forced to make a showing of the manner in which he had administered his trust, he sought to justify the *Page 184 
expenditures and compensation sought for out of the estate, by taking the ex parte affidavit of Judge Green, no notice having been given that such testimony was to be taken, or intended to be taken.
No room is furnished by the evidence to review the discretion and conclusions, findings and judgment of the district court, and they will be affirmed.
Bierer, J. and Keaton, J., concur in the conclusion reached in affirming the judgment of the trial court on the general finding of facts based upon the evidence in the case; Tarnsney, J., not concurring and reserving the right to file a dissenting opinion; Dale C. J., not sitting.